UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL CASE NO. 22-75-DLB-CJS

CHARLIE COLEMAN, et al.                                                                 PLAINTIFFS

v.                           MEMORANDUM OPINION AND ORDER

JANIS WINBIGLER, et al.                                                                  DEFENDANTS

\* \* \* \* \* \* \* \* \* \*

Sacrosanct to American Democracy is the principle of one person, one vote. This idea first emerged in Supreme Court jurisprudence in *Baker v. Carr*, 369 U.S. 186, but the popularized mantra was recited for the first time in *Wesberry v. Sanders*, which held that "one man's vote in a congressional election is to be worth as much as another's." 376 U.S. 1, 8 (1964). Plaintiffs Charlie Coleman, Noah Heim, Amy Dowton, and David Meyer each allege that due to a failure of Defendants, their votes for Campbell County School Board are diluted in violation of the one person, one vote principle. (*See generally* Doc. # 1). In order to timely address their concerns before the upcoming November election, Plaintiffs filed a Motion for Preliminary or Permanent Injunction on June 8, 2022. (Doc. # 5). On July 7, 2022, Defendants Janis Winbigler, Joshua Perkins, Kimber Fender, Peggy Schultz, and Richard Mason, each sued in their official capacities as members of the Campbell County Board of Education, filed a Response opposing Plaintiffs' Motion. (Doc. # 15). Thereafter, Plaintiffs filed a Reply. (Doc. # 16). Defendants James Luersen, Mike Jansen, Jack Snodgrass, and Jim Schroer, each sued in their official capacities as

1

Campbell County Clerk, Campbell County Sheriff, and members of the Campbell County Board of Election, respectively, filed a joint Agreed Order with Plaintiffs, adopted by the Court, indicating that those Defendants agree to be bound by any order of the Court, but are not required to participate in the litigation.  (Docs. # 13 and 14).  On July 14, 2022, the Court held a Hearing on the Motion.  (Doc. # 17).  At the Hearing, the Court noted that it would enter an opinion adjudicating the Motion expeditiously.  (*Id.* at 2).  For the reasons stated herein, Plaintiffs' Motion for a Preliminary Injunction is **granted**.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs Coleman, Heim, Dowton, and Meyer are each residents and voters in Campbell County, Kentucky, who reside in the districts responsible for electing the third and fourth seat on the Campbell County School Board ("the School Board").  (Doc. # 1 ¶¶ 1-4).  The School Board is comprised of five members, who are each elected from five districts.  (*Id.* ¶ 9).  Plaintiffs allege a single federal cause of action—a violation of the Equal Protection Clause under 42 U.S.C. § 1983.  (*Id.* ¶¶ 17-24).  Plaintiffs' main contention is that two of the school board districts (Two and Four), one of which is where Plaintiffs reside, are over-populated as compared to the other districts, and thus violate the constitutional principle of "one person, one vote." (*See* generally Doc. # 5).

Population data from the 2020 Census gives the Court a starting point to evaluate Plaintiffs' claims.[1]  Based on this data, each of the School Board districts at issue have the following populations according to the 2020 Census:

---

[1] This data is from Plaintiff's declaration by Nicole Tovey, who used the United States Census Bureau's dataset, which is accessible through the data.census.gov web domain.  Data for the split voting precincts located in District 3 were determined by finding the corresponding voting tracts and blocks included in Campbell County School District by utilizing the map interface at tigerweb.geo.census.gov/tigerweb2020 and then pulling population data on those voting tracts/blocks from the Census Bureau dataset discussed above.  (*See generally* Doc. # 16-1).

### District 1

| Precinct | Population |
|---|---:|
| Southgate C | 390 |
| Southgate D | 823 |
| Wilder | 1887 |
| Highland Heights B | 1361 |
| Johns Hill | 2132 |
| Highland Heights E | 1898 |
| **TOTAL:** | **8491** |

### District 2

| Precinct | Population |
|---|---:|
| Highland Heights C | 691 |
| Highland Heights D | 1337 |
| Cold Spring A | 981 |
| Cold Spring B | 1397 |
| Cold Spring C | 2153 |
| Cold Spring D | 1432 |
| Cold Spring F | 2730 |
| **TOTAL:** | **10721** |

### District 3

| Precinct | Population |
|---|---:|
| Alexandria A | 1511 |
| Camp Springs | 1345 |
| Cold Springs E | 916 |
| Fort Thomas J | 1160 |
| Highland Heights A | 709 |
| Melbourne | 432 |
| Ross | 1088 |
| Silver Grove | 1245 |
| Bellevue B (split)[2] | 72 |
| Dayton C (split) | 98 |
| Newport H (split) | 193 |
| **TOTAL:** | **8769** |

---

[2] The split voting precincts were determined as described above, *supra* n.1, but any population difference in these specific precincts due to user error is not constitutionally significant. Further, at the hearing, Plaintiffs informed the Court that they received tract and block data from Defendants that confirmed their population counts for the split precincts. Defendants further acknowledged at the hearing that they do not dispute the raw population counts.

### District 4

| Precinct | Population |
|---|---:|
| Alexandria B | 1452 |
| Alexandria C | 2425 |
| Alexandria D | 1521 |
| Alexandria E | 2041 |
| Alexandria F | 2474 |
| Alexandria G | 1403 |
| **TOTAL:** | **11316** |

### District 5

| Precinct | Population |
|---|---:|
| California | 988 |
| Claryville | 2349 |
| Grants Lick | 2860 |
| Mentor | 1102 |
| Sun Valley | 2569 |
| **TOTAL:** | **9869** |

Based on the alleged vote dilution occurring in the above School Board districts, Plaintiffs request the following relief: (I) a declaration that Defendants' refusal to redraw the school board maps was unconstitutional, (II) issuance of an injunction enjoining the use of the malapportioned districts, requiring the Board of Education to draw new districts in time for the November 2022 election, (III) nominal damages for the constitutional violations complained of, and (IV) an award of costs, including attorney fees under 42 U.S.C. § 1988.  (Doc. # 1 at 6).

## II. ANALYSIS

### A. Standard of Review

To determine whether a party should be granted a preliminary injunction, a court weighs the following factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020) (quoting *Am. Civ. Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015)). The preceding factors are not prerequisites that must be met; instead, they are to be balanced by the court in order to determine whether a preliminary injunction is the appropriate remedy. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). Although the party moving for a preliminary injunction "is not required to prove his case in full at a preliminary injunction hearing, it remains the case that preliminary injunctions are an extraordinary and drastic remedy." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (internal citations and quotations omitted). The moving party bears the burden of establishing the necessity of the preliminary injunction. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir 2012).

However, injunctions premised on an ongoing constitutional violation have a slightly different framework. "Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020). In fact, "when reviewing a motion for a preliminary injunction, if it is found that a constitutional

5

right is being threatened or impaired, a finding of irreparable injury is *mandated*." *Am. Civ. Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (emphasis added).

### B. Likelihood of Success on the Merits

If Plaintiffs are unlikely to succeed on the merits of its case, the first factor in the Court's analysis weighs against granting the motion for a preliminary injunction. Plaintiffs are required to show "a strong likelihood of success on the merits," *Hargett*, 978 F.3d at 385 (quoting *Am. Civ. Liberties Union*, 796 F.3d at 642), instead of "a mere possibility of success," *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)). However, where a constitutional right "is being threatened or impaired . . . the first factor of the four-factor preliminary injunction inquiry—whether the plaintiff shows a substantial likelihood of succeeding on the merits—should be addressed first insofar as a successful showing on the first factor mandates a successful showing on the second factor—whether the plaintiff will suffer irreparable harm." *ACLU of Ky.*, 354 F.3d at 445.

The Fourteenth Amendment's Equal Protection Clause has been read to find a right "to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973). As stated by the Sixth Circuit, "vote dilution is as nefarious as an outright prohibition on voting." *Duncan v. Coffee Cnty, Tenn.*, 69 F.3d 88, 93 (6th Cir. 1995).

In *Brown v. Ky. Legislative Research Comm'n*, which originated in this Court, a three-judge panel determined that Kentucky's legislative reapportionment plan for state legislator elections was "so malapportioned" that it diluted votes and therefore violated the Equal Protection Clause. 966 F. Supp. 2d 709, 725 (E.D. Ky. 2013). Defendants contend that this opinion "has no applicability to local county school boards" and "KRS 160.210 governs how and when divisions can be re-drawn." (Doc. # 15 at 18). However, during oral argument, Defendants seemed to abandon the argument that school boards are not subject to the Equal Protection Clause requirements, and conceded that the "one person, one vote" requirement applies to school board elections. Nevertheless, since the argument was briefed, the Court will cursorily address it for sake of completeness.

Whether *Brown* is applicable to local school board elections is dependent on whether there is a constitutional right to elect school board members, much like the right to elect state representatives. In the specific context of school boards, the Supreme Court held in *Sailors v. Board of Education of Kent County*, that there was "no constitutional reason why state or local officers" may be chosen "by some other appointive means rather than by an election." 387 U.S. 105, 108 (1967). While this may appear to end the Court's inquiry, as is often the case, it is not that simple.

The Sixth Circuit has interpreted the holding in *Sailors* to mean that there is no "fundamental right to elect an administrative body such as a school board." *Mixon v. State of Ohio*, 193 F.3d 389, 403 (6th Cir. 1999). However, *Mixon* explicitly draws a distinction between the appointment of school board members and the election of school board members—"[a]lthough [p]laintiffs have a fundamental right to vote in elections before them, there is no fundamental right to elect an administrative body such as a school

board, even if other cities in the state may do so." *Id.* Therefore, while citizens of a specific area may not be constitutionally entitled to vote in school board elections, if a governing body determines that schools board members will be elected, rather than appointed, the fundamental right to vote applies.[3]

This finding is supported by the Sixth Circuit's decision in *Board of County Commissioners of Shelby County, Tennessee v. Burson*, where it applied the "one person, one vote" principle to a proposed plan to reapportion Shelby County Board of Education to be elected from seven single member districts. 121 F.3d 244, 246 (6th Cir. 1997). The at issue plan gave residents from the county, that did not live in the Shelby County School District, a voting majority in six out of the seven school board districts. *Id.* at 247. This plan was proposed because the Tennessee Constitution requires "all popularly elected county officials, including county school board members, be elected by all voters within the county." *Id.* at 246. The Sixth Circuit explained that "state constitutions must give way to the requirements of the Supremacy Clause when there is a conflict with the federal Constitutional" when it ultimately determined that adopting the proposed plan would "unconstitutionally dilute the votes of residents in the Shelby County School District by placing the overwhelming majority of ballots in the hands of out-of-district voters." *Id.* at 249-50.

---

[3] Other circuits have come to this same conclusion that the principle applies to the elections of school board members. The First Circuit, in *Kelleher v. Southeastern Regional Vocational Technical High School District*, determined that the school district's apportionment scheme "violate[d] the one person-one vote principle because, by not dividing the district's elected Committee members on a population basis as nearly as practical, it deprives voters of the constitutional right to cast an equally weighted vote." 806 F.2d 9, 13 (1986). Further, a later Fourth Circuit case, *Daly v. Hunt*, reviewed whether districts for the Board of Education violated the one person, one vote principle, implicitly deciding that the principle applies to Board of Education elections. 93 F.3d 1212 (4th Cir. 1996).

As for the school board's apparent inability to redraw the district due to Ky. Rev. Stat. § 160.210(3), which states that "no change may be made in division boundary lines less than five (5) years after the last change in any division line[,]" Plaintiffs have not brought a challenge to Ky. Rev. Stat. § 160.210. The only cause of action alleged by Plaintiffs is a claim under § 1983. (*See generally* Doc. # 1). In fact, Ky. Rev. Stat. § 160.210(3) was brought to light by Defendants as a shield from § 1983 liability, or alternatively, a rationalization as to why they feel they cannot reapportion the school districts. In essence, Plaintiffs bring a § 1983 claim for vote dilution, much like the claim discussed in *Reynolds v. Sims*, 377 U.S. 533 (1964). There, the Supreme Court held that:

> [T]he Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race or economic status.

*Id.* at 566 (internal citations omitted).

Regardless, Defendants argue that Plaintiffs may pursue an "adequate remedy at state law" outlined under Ky. Rev. Stat. § 160.210, which Plaintiffs have not exhausted, and therefore are barred from pursuing their Equal Protection claim. (Doc. # 15 at 11). This argument is premised on a misunderstanding of the purpose of § 1983. Congress' purpose in establishing 42 U.S.C. § 1983 was to provide a supplement to "any state remedy." *Cloud v. Dietz*, 342 F. Supp. 1146, 1148 (E.D. Ky. 1971). As explained by the Supreme Court in *Monroe v. Pape*, § 1983 was created in order to "afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be

9

denied by the state agencies." 365 U.S. 167, 180 (1961). In *King v. Smith*, the Supreme Court explicitly held that a plaintiff is not required to exhaust state remedies prior to bringing an action under § 1983 "where the constitutional challenge is sufficiently substantial, as here, to require the convening of a three-judge court." 392 U.S. 309, 312 n.4 (1968).[4]

The decision to not require administrative exhaustion has been extended to suits under the Equal Protection Clause of the Fourteenth Amendment. While the Supreme Court has required plaintiffs who bring Fourteenth Amendment procedural due process claims to exhaust state remedies, *Parratt v. Taylor*, 451 U.S. 527, 537 (1981), the Sixth Circuit has refused to extend this reasoning to Equal Protection claims. *Abdur-Rahman v. Settles*, 848 F.2d 188, 1988 WL 48410, at *3 (6th Cir. May 16, 1988) (unpublished table decision). In *Abdur-Rahman*, the Sixth Circuit explained that this requirement to exhaust state remedies "is not applicable to claims based on a right, privilege, or immunity secured by the Constitution or federal laws other than the due process clause of the fourteenth amendment." *Id.; see also Hayes v. Vessey*, 777 F.2d 1149, 1152 (6th Cir. 1985) (explaining the holding in *Wilson v. Beebe*, 770 F.2d 578 (6th Cir. 1996) (*en banc*), which established that *Parratt*'s holding "does not apply" when the claim is "based on a right, privilege, or immunity secured by the Constitution or federal laws other than the Due Process Clause of the Fourteenth Amendment . . . .") (internal quotations omitted).

Defendants further cite to *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), for the premise that Plaintiffs' Equal Protection claim is "beyond this Court's reach

---

[4] While a three-judge court is not required in this instance, it is generally required "when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284(a).

10

as a matter of law . . . ." (Doc. # 15 at 14).⁵  As explained in *Moore v. Sims*, *Pullman* abstention applies to "broad-based challenges are made to state statutes—for the broader the challenge, the more evident each consideration becomes." 442 U.S. 415, 428 (1979). *Pullman* is simply inapplicable here because Plaintiffs are bringing an Equal Protection challenge, not a broad facial challenge against Ky. Rev. Stat. § 160.210. "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Hanna v. Toner*, 630 F.2d 442, 445 (6th Cir. 1980) (quoting *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 813 (1976)).

Here, the constitutional determination of whether Campbell County's school board districts violate the Fourteenth Amendment's Equal Protection Clause is not "predicated on a reading of [Ky. Rev. Stat. § 160.210]," nor is there a "need for a concrete case or controversy" as one clearly exists. *Moore*, 442 U.S. at 428. As aptly explained by the Sixth Circuit, the *Pullman* doctrine is "an equitable doctrine, 'typically applied when an unsettled state-law question is best decided by or already pending in state courts.'" *Libertas Classical Ass'n v. Whitmer*, No. 20-2085, 2020 WL 6886262, at *2 (6th Cir. Nov. 20, 2020). That is not the case here. Therefore, this controversy is not the "exceptional circumstance[]" where *Pullman* abstention is needed, and a decision determining whether Campbell County's school districts as drawn are unconstitutional is justiciable in this Court. *Cnty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959).

---

⁵ Defendants also cite to *Moore v. Sims*, 442 U.S. 415 (1979), which in addition to *Pullman* abstention discussed *Younger* abstention, which was established in *Younger v. Harris*, 401 U.S. 37. For the sake of clarity, the Court notes that *Younger* abstention is immaterial to the case at hand because it is only applicable when there is a pending state proceeding. *Moore*, 442 U.S. at 423.

11

Therefore, the Court must turn to the constitutional inquiry at-hand—whether the Campbell County School Board districts are so malapportioned as to violate the principle of one person, one vote, protected by the Fourteenth Amendment's Equal Protection Clause. To determine the maximum acceptable deviation percentages "relevant to the Equal Protection Clause analysis, the court must: (1) calculate the ideal legislative district by dividing the total population by the number of legislative districts; (2) identify the districts of the challenged plan with the largest deviations above and below the ideal legislative district; and (3) measure the difference between the deviations of those districts." *Brown*, 966 F. Supp. 2d at 722 (citing *Connor v. Finch*, 431 U.S. 407, 416-17 (1977)). Pursuant to Ky. Rev. Stat. § 160.210, "[i]n county school districts, members shall be elected from divisions." These divisions are created by dividing each "district into five (5) divisions containing integral voting precincts [] as equal in population insofar as is practicable." Ky. Rev. Stat. § 160.210(2).

The populations of each School Board district, as well as the total population within the Campbell County School District based on the 2020 Census, are as follows:

| District | Population |
|---|---:|
| District 1 | 8491 |
| District 2 | 10721 |
| District 3 | 8769 |
| District 4 | 11316 |
| District 5 | 9869 |
| **TOTAL:** | **49165** |

The total population of the Campbell County School District is 49,165. Therefore, the average/ideal population per district, which is calculated by dividing the total population by five (the number of districts), is 9,833. Next, the Court must identify the districts with the largest deviation from the ideal district and measure the difference

between these deviations.  *Brown*, 966 F. Supp. 2d at 722 (citing *Connor v. Finch*, 431 U.S. 407, 416-17 (1977)).  These calculations are as follows:

| District | Population | Deviation from Mean | Difference between Largest and Smallest District |
|---|---|---|---|
| District 1 | 8491 | -13.65% | |
| District 2 | 10721 | 9.03% | 22.68% |
| District 3 | 8788 | -10.82% | |
| District 4 | 11316 | 15.08% | 28.73% |
| District 5 | 9869 | 0.36% | |

Based on the average/ideal population size, Districts 2 and 4 are constitutionally infirm as votes by citizens in those voting districts are diluted.  "[A] maximum population deviation of 10% or greater 'creates a prima facie case of discrimination and therefore must be justified by the state.'"  *Id.* at 717 (quoting *Brown v. Thomson*, 462 U.S. 835, 842 (1983)).  To create a justification, Defendants are required to demonstrate that the population deviation "may reasonably be said to advance a rational [] policy," and "is applied in a manner 'free from the taint of arbitrariness or discrimination.'"  *Id.* (quoting *Thompson*, 462 U.S. at 843).

Importantly, even if Defendants are able to demonstrate a rational policy and that the policy is applied without arbitrariness or discrimination, "the divergences still must be within 'tolerable limits.'"  *Id.* (quoting *Mahan v. Howell*, 410 U.S. 315, 326 (1973)).  In *Mahan*, the Supreme Court made clear that a "policy urged in justification of disparity in district population, *however rational*, cannot constitutionally be permitted to emasculate the goal of substantial equity."  410 U.S. at 326 (emphasis added).  In *Mahan*, the Court discussed a numerical disparity of 16.4% "may well approach tolerable limits," ultimately finding that the defendant did "not sacrifice[] substantial equality to justifiable deviations."  *Id.* at 329.

Based on the applicable controlling authority, it is apparent that the 22.68% and 28.73% deviations found in District 2 and District 4 respectively require a finding that the school board districts as drawn are "presumptively unconstitutional under the Equal Protection Clause of the Fourteenth Amendment." *Brown*, 966 F. Supp. 2d at 723. While Defendants offer a rationalization for the deviation—following the plain text of Ky. Rev. Stat. § 160.210 by not redistricting more than once every five years and ensuring that precincts are not divided—the Court finds that the deviations exceed justifiable deviations. (Doc. # 15 at 20-21). Defendants also argue that their actions were not malicious, in bad faith, or intended to discriminate. (*Id.* at 20). The Court believes that Defendants did not intend to discriminate against specific Districts, and that they felt obligated to follow their statutorily proscribed duties under Ky. Rev. Stat. § 160.210. However, acting in good faith does not allow Defendants to abstain from their duty to follow the Equal Protection Clause of the Fourteenth Amendment.

Defendants rely on *Brown v. Thomson* for the premise that excessive deviations are upheld when there is no "taint of arbitrariness or discrimination." (*Id.* at 22) (quoting 462 U.S. at 848). However, *Thomson* is easily factually distinguishable from this case. To start, the Supreme Court specifically withheld ruling on whether "Wyoming's nondiscriminatory adherence to county boundaries justifies the population deviations that exist throughout Wyoming's representative districts" explaining that "[t]he issue therefore is not whether a 16% average deviation and an 89% maximum deviation, considering the state apportionment plan as a whole, are constitutionally permissible." *Thomson*, 462 U.S. at 846. Instead, the *Thomson* Court was determining only whether Wyoming's Constitution, which required each county to be both a senatorial and representative

14

district, justified "additional deviations from population equality" so that a specific county could maintain representation. *Id.* at 837, 846. In other words, if the Court found the deviation to be substantial, a single county in Wyoming would lose all representation in state matters. Further, the Supreme Court found persuasive that due to the Wyoming Constitution's mandate, "the State's apportionment formula ensures that population deviations are *no greater than necessary* to preserve counties as representative districts." *Id.* at 844 (emphasis added). That is not the case here. As explained by Defendants, Ky. Rev. Stat. § 160.210 requires that school districts "contain[] integral voting precincts and [be] as equal in population insofar as practicable." (Doc. # 15 at 2). Containing integral voting precincts requires that precincts should not be split among different districts. (*Id.* at 3). Unlike in *Thomson*, the deviations in population between the districts are not equal in population insofar as practicable. Defendants could easily maintain the integrity of voting precincts while equalizing the populations between the school districts. As explained by the Court at oral argument, by moving two single precincts to different districts, the unconstitutional deviations would fall well below the constitutional suspect limitation of 10%.

Ultimately, the Court concludes that Defendants' stated rationale does not justify the population deviations of the magnitude found in this case—22.68% and 28.73%. Even assuming *arguendo* that the rationalization justified the population deviations, the Supreme Court has opined that a 16.4% deviation, with a compelling state rationalization, "may well approach tolerable limits." 410 U.S. at 326. Here, both of the larger deviations—22.68% and 28.73%—are 6% and 12% higher than the deviation in *Mahan*. If 16.4% "approached tolerable limits," surely almost 23% and 29% exceed those limits.

A temporary injunction is an "extraordinary and drastic remedy . . . that should only be awarded upon a clear showing that the plaintiff is entitled to such relief." *S. Glazer's Distrib. of Ohio v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). Here, Plaintiffs' have established a continuing constitutional violation and therefore, are entitled to this extraordinary remedy.

### C. Irreparable Injury

The moving party must show that in the absence of injunctive relief, it would suffer irreparable injury. To be considered irreparable, the injury resulting from the denial of injunctive relief cannot be "fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Allegations of constitutional violations are among those most likely to cause irreparable injury. As discussed above, "when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is *mandated*." *ACLU of Ky.*, 354 F.3d at 445 (emphasis added).

If the Court were to not issue this preliminary injunction, in November 2022 voters in District 4 would undoubtedly suffer irreparable harm, in the form of a violation of their constitutional rights. The citizens residing in District 4, with a 30% larger population than the other district voting on that same day, would be deprived of their clear "constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).

### D. Substantial Harm to Others & Public Interest

Next, the Court must consider whether granting a preliminary injunction will result in substantial harm to others and whether an injunction would serve the public interest.

16

For example, Defendants allege that if the Court ordered them to re-draw the school board divisions particular voters will be harmed. (Doc. # 15 at 10). Specifically, Defendants claim that redistricting could delay the opportunity of certain residents in Divisions 1 and 4 to vote in the upcoming election if those residents were moved into one of the Divisions not voting for a School Board member in 2022. (*Id.*). As proscribed by Ky. Rev. Stat. § 160.200(1), elections for board of education members "shall be in even numbered years, for a term of four (4) years." This staggering of elections means that in the November 2022 election, Division 1 and 4 members will be on the ballot and two years later, in November 2024, Division 2, 3, and 5 members will be on the ballot.

However, staggering elections necessarily means that in any given year when the board determines redistricting is necessary, some residents will be unable to vote when they otherwise would have been able to prior to redistricting. As cited in Plaintiff's Reply, the Ninth Circuit has denied a similar argument, observing that "stagger[ing] is immaterial to the voter denial claim at issue" as the burden on voters who are "unable to vote [] in a given election year . . . quickly evens out over time." *Public Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019, 1027 (9th Cir. 2016).

To the contrary, the unconstitutional dilution of votes does not "even[] out over time." *Id.* Instead, "[i]f districts of widely unequal population elect an equal number of representatives, the voting power of each citizen in the large constituencies is debased and the citizens in those districts have a smaller share of representation than do those in smaller districts." *Bd. of Estimate of City of N.Y. v. Morris*, 489 U.S. 688, 693-94 (1989). Therefore, those who will actually suffer substantial harm are those voters in much larger school board districts if this Court were to refuse to grant an injunction.

Further, the preliminary injunction would serve the public interest because the participation in elections is fundamental to American democracy. "[V]oting is of the most fundamental significance under our constitutional structure[,]" and therefore, the protection of the one person, one vote mantra, surely serves the public interest. *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). Ultimately, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

### E. Weighing of Factors

As explained in the discussion above, each of the factors in favor of this Court granting a preliminary injunction.[6] Plaintiffs have demonstrated a strong likelihood of success on the merits in the Complaint, that irreparable harm would occur in the absence of an injunction, that voters may suffer harm if the injunction was not granted, and the public interest favors granting the injunction.

### III. CONCLUSION

Thus, for the reasons articulated herein,

**IT IS HEREBY ORDERED** as follows:

(1)  Plaintiffs' Motion for a Preliminary Injunction (Doc. # 5) is **granted**;

(2)  Campbell County School Board Districts 2 and 4 are held to be in violation of the Fourteenth Amendment Equal Protection Clause, under the "one person, one vote" rule;

---

[6]  The Court does not anticipate that any amount of discovery would change the outcome provided herein. However, a permanent injunction is not appropriate because the parties have not had a final trial on the merits. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 396 (1981).

(3)     Campbell County School Board Defendants are enjoined from utilizing the school district maps as currently drawn;

(4)     Ky. Rev. Stat. § 160.210's prohibition on changing the boundaries of school district lines less than five (5) years after the last change to district lines is unconstitutional as applied in the upcoming Campbell County School Board election;

(5)     **Not later than August 1, 2022**, the Campbell County School Board Defendants are ordered to re-draw the school board districts to provide for a more equitable division of population; and

(6)     If the Campbell County School Board Defendants fail to re-draw the school board districts to comply with this Order by the deadline set forth herein, this Court will re-draw appropriate districts by August 15, 2022.

This 15th day of July, 2022.

Signed By:
David L. Bunning
United States District Judge

M:\DATA\ORDERS\Cov2022\22-75 PI MOO.docx